JAMES B. and DOROTHY B. HODGES, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hodges v. Commissioner
Docket Nos. 24835-85, 25210-85, 13148-86, 20740-86, 21253-86, 22618-86, 43317-86, 16622-87, 20215-87, 32627-87, 39041-87, 5602-88, 14473-88, 25636-88
United States Tax Court
T.C. Memo 1992-370; 1992 Tax Ct. Memo LEXIS 394; 63 T.C.M. (CCH) 3198; June 29, 1992, Filed *394 Decisions will be entered under Rule 155 in the following cases: docket No. 24835-85; docket Nos. 25210-85 and 14473-88; docket No. 20740-86; docket No. 21253-86; docket No. 22618-86; docket No. 16622-87; docket Nos. 20215-87 and 25636-88; docket No. 5602-88, and docket No. 13148-86. Orders will be issued restoring the following cases to the general docket for disposition of remaining issues: docket No. 43317-86; and docket Nos. 32627-87 and 39041-87. Jack Elon Hildreth, Jr., for petitioners in docket Nos. 24835-85, 25210-85, and 14473-88. Steven L. Staker, for petitioners in docket Nos. 13148-86, 20740-86, 21253-86, 22618-86, 43317-86, 16622-87, 20215-87, 32627-87, 39041-87, 5602-88, and 25636-88. Sherri L. Feuer, for respondent. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These cases were assigned to Special Trial Judge James M. Gussis pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion *395 of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GUSSIS, Special Trial Judge: Respondent determined deficiencies, increased interest, and additions to tax in these cases as follows: James B. and Dorothy B. Hodges
Docket No. 24835-85
Increased Interest and Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6651(a)(1)
6653(a)(1)
6653(a)(2)
1981
$ 28,135.00
applicable
$ 1,263.05
$ 2,400.80
50% of the
interest due
on $ 28,135.00
In docket No. 24835-85 respondent has conceded the addition to tax under section 6651(a)(1). A. Gordon Keyes, Jr. and Barbara J. Keyes
Docket No. 22618-86
Increased Interest and Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)
6653(a)(1)
6653(a)(2)
6661(a)
1979
$ 3,514.00
applicable
$ 175.70
--
--
-- 1982
8,542.00
applicable
--
$ 427.10
50% of the
[1] $ 854.20
interest due
on $ 8,542.00
*396 Charles H. Merrill and Bernadette R. Merrill
Docket No. 16622-87
Increased Interest and Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)(1)
6653(a)(2)
6659
1983
$ 3,754.00
applicable
$ 187.70
50% of the
$ 1,126.20
interest due
on $ 3,754.00
Stanley M. Riffe and Phyllis W. Riffe
Docket No. 20740-86
Additions to Tax
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
1982
$ 13,358.00
$ 668.00
50% of the
interest due
on $ 13,358.00
By amended answer for docket No. 20740-86, respondent asserted increased interest and an addition to tax under sections 6621(c) and 6661(a). Wilbur L. Rigmaiden and Patricia R. Rigmaiden
Docket No. 5602-88
Increased Interest and Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)(1)
6653(a)(2)
6661(a)
1981
$ 6,726.00
applicable
$ 336.30
50% of the
--   interest due
on $ 6,726.00
1982
5,774.00
applicable
288.70
50% of the
$ 1,443.50
interest due
on $ 5,774.00
Per T. Ron and Sonja Ron
Docket No. 20215-87
Increased Interest
and Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)
6653(a)(1)
1980
$ 1,387.00
--   $ 69.35
--   1983
19,865.00
applicable
-- $ 993.25
*397 Increased Interest
and Additions to Tax
Sec.
Sec.
Sec.
Year
6653(a)(2)
6659
6661(a)
1980
--
--
--   1983
50% of the
--
$ 4,966.25
interest due
on $ 19,865.00
Per T. Ron and Sonja Ron
Docket No. 25636-88
Increased Interest
and Additions to Tax
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)(1)
1981
$ 20,720.89
applicable
$1,036.04
1982
29,855.00
applicable
1,492.75
Increased Interest
and Additions to Tax
Sec.
Sec.
Sec.
Year
6653(a)(2)
6659
6661(a)
1981
50% of the
$ 6,216.26
--
interest due
on $ 20,720.89
1982
50% of the
8,942.10
--
interest due
on $ 29,807.00
By amended answer for docket No. 20215-87, respondent asserted increased interest under section 6621(c) for 1980. By amended answer for docket No. 25636-88, respondent asserted an addition to tax under section 6661(a) for 1982. John W. Rutland
Docket No. 25510-85
Increased Interest and Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)(1)
6653(a)(2)
6659
1981
$ 2,245.00
applicable
$ 112.25
50% of the
$ 673.50
interest due
on $ 2,245.00
John W. Rutland
Docket No. 14473-88
Increased Interest and Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)(1)
6653(a)(2)
6659
1984
$ 1,705.00
applicable
$ 85.00
50% of the
$ 512.00
interest due
on $ 1,705.00
*398 Richard F. Standfest and Lucinda D. Standfest
Docket No. 43317-86
Increased Interest
and Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)
6653(a)(1)
1979
$ 4,033.00
--    $ 202.00
--   1980
8,114.00
--    406.00
--   1981
2,710.00
--    --  $ 136.00
1982
37,963.00
applicable
--  1,898.00
1983
21,425.00
applicable
--  1,071.00
Increased Interest
and Additions to Tax
Sec.
Sec.
Year
6653(a)(2)
6661
1979
--
--
1980
--
--
1981
--
--
1982
50% of the
$ 3,796.00
interest due
on $ 37,963.00
1983
50% of the
2,143.00
interest due
on $ 21,425.00
By amended answer for docket No. 43317-87, respondent asserted an addition to tax under section 6653(a)(2) for 1981 and increased interest under section 6621(c) for 1979 and 1980. By amended answer, respondent claimed an increased rate for the section 6661(a) addition from 10 percent to 25 percent for the years 1982 and 1983. Jolinda A. Traugh
Docket No. 13148-86
Increased Interest and Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)(1)
6653(a)(2)
6661(a)
1981
$ 9,732.00
applicable
$ 487.00
50% of the
--   interest due
on $ 9,732.00
1982
11,955.00
applicable
598.00
50% of the
$ 1,196.00
interest due
on $ 11,955.00
1983
9,118.00
applicable
456.00
50% of the
912.00
interest due
on $ 9,118.00
*399 By amended answer for docket No. 13148-86, respondent claimed an increased rate for the section 6661(a) addition from 10 percent to 25 percent for the years 1982 and 1983. Clione M. Vesely
Docket No. 21253-86
Increased Interest and Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)(1)
6653(a)(2)
1982
$ 2,998.00
applicable
$ 150.00
50% of the
interest due
on $ 2,998.00
1983
4,613.00
applicable
231.00
50% of the
interest due
on $ 4,613.00
James F. Wann, Jr. and Lavonne M. Wann
Docket No. 39041-87
Increased Interest and
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6651(a)(1)
6653(a)(1)
1981
$ 14,898.22
applicable
$ 3,129.00
$ 824.66
Increased Interest and
Additions to Tax
Sec.
Sec.
Sec.
Year
6653(a)(2)
6659
6661(a)
1981
50% of the
$ 4,124.00
--
interest due
on $ 14,898.22
James F. Wann, Jr. and Lavonne M. Wann
Docket No. 32627-87
Increased Interest and
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6651(a)(1)
6653(a)(1)
1982
$ 17,064.00
applicable
$ 3,364.00
$ 853.20
1983
12,589.95
applicable
2,595.73
695.10
*400 James F. Wann, Jr. and Lavonne M. Wann
Docket No. 32627-87
Increased Interest and
Additions to Tax
Sec.
Sec.
Sec.
Year
6653(a)(2)
6659
6661(a)
1982
50% of the
--
$ 3,613.75
interest due
on $ 17,064.00
1983
50% of the
--
2,641.00
interest due
on $ 12,589.95
Respondent has now conceded that the addition to tax under section 6659 is inapplicable in these cases. In docket Nos. 32627-87 and 39041-87, petitioners James F. Wann, Jr. and Lavonne M. Wann have conceded the deductions pertaining to Oil Recovery Systems for the years 1981, 1982, and 1983. Petitioner James F. Wann, Jr. has also conceded the innocent spouse issue raised under section 6013(e) in these cases. After concessions, the issues for decision are: (1) Whether petitioners are entitled to deductions for development expenses under section 616 or exploration expenses under section 617 with respect to investments in certain gold mining programs; (2) whether petitioners Hodges and Rutland are entitled to loss deductions under section 165; (3) whether petitioners are liable for increased interest under section 6621(c); (4) whether petitioners are liable for the additions to tax for negligence *401 under section 6653(a)(1) and (2); and (5) whether petitioners are liable for the additions to tax under section 6661(a) for substantial understatements of Federal income tax liability. Certain issues remaining in docket Nos. 39041-87 and 32627-87 (James F. Wann, Jr. and Lavonne M. Wann), and in docket No. 43317-86 (Richard F. Standfest and Lucinda D. Standfest) will be addressed in subsequent proceedings. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner James B. Hodges is a marine engineer with a business degree from the University of Southern California. In 1981, Mr. Hodges was engaged in real estate development activities. James B. and Dorothy B. Hodges resided in San Clemente, California, when their petition was filed. Petitioner A. Gordon Keyes, Jr. was a crane operator in 1982. A. Gordon Keyes, Jr. and Barbara J. Keyes resided in Fontana, California, when their petition was filed. Petitioner Charles H. Merrill grew up on a farm and was a warehouse worker during the taxable year. Charles H. Merrill and Bernadette R. Merrill resided in Running *402 Springs, California, and Riverside, California, respectively, when their petition was filed. Petitioner Stanley M. Riffe is an engineer and was a program manager for an aerospace company during the taxable year 1982. Stanley M. Riffe and Phyllis W. Riffe resided in Tucson, Arizona, when their petition was filed. Petitioner Wilbur L. Rigmaiden has two years of college education and was an insurance salesman during the taxable years here involved. Wilbur L. Rigmaiden and Patricia R. Rigmaiden resided in Newport Beach, California, when their petition was filed. Petitioner Per T. Ron is a licensed civil and structural engineer in California. Per T. Ron and Sonja Ron resided in Riverside, California, when their petitions were filed. Petitioner John W. Rutland has two years of junior college education and was an aerospace engineer during the taxable years here involved. John W. Rutland resided in Long Beach, California, when his petition was filed. Richard F. Standfest and Lucinda D. Standfest resided in Sunnymead, California, when their petition was filed. Petitioner Jolinda A. Traugh has a doctoral degree and was a professor of biochemistry at the University of California at *403 Riverside during the taxable years. Jolinda A. Traugh resided in Riverside, California, when her petition was filed. Petitioner Clione M. Vesely was a registered nurse during the taxable years involved. Clione M. Vesely resided in Montrose, California, when her petition was filed. Petitioner Lavonne M. Wann was a tax preparer during the taxable years involved. James F. Wann, Jr. and Lavonne M. Wann resided in Riverside, California, when their petition was filed. During the period here involved International Recovery, Inc. (International), was engaged in several programs involving gold mines. Generally, investors were offered units in one or more of three mining programs promoted by International: The Reward Brown Monster mine program (hereinafter the Reward Brown program), the Cassill mine program (Cassill program), and the Tiedeman mine program (Tiedeman program). Generally, investors purchase mineral aggregate or ore from a particular mine and were required to make a payment in the form of cash and a promissory note to cover the mining expenses purportedly incurred in mining the aggregate. Investors then claimed the total mining expenses (cash plus note) as mining development *404 deductions on Schedule C of their respective tax returns. Gold deposits in the Reward Brown mine were concentrations of gold that formed in a quartz rock vein. Mining this type of deposit required underground tunneling. Placer deposits are essentially buried stream or river beds where rock and gravel containing gold settled after it was eroded and washed away from gold-bearing land formations. Successive layers of sediment or volcanic deposit then covered this alluvium to varying depths. Gold deposits in the Cassill and Tiedeman mines were of this type. The placer deposits in the Tiedeman mine were close enough to the surface and were amenable to strip mining. In the Cassill mine, the placer deposits were much deeper and required tunneling in much the same manner as for the Reward Brown vein. A proven or measured body of ore is one that has been systematically drilled or measured by physical workings which block out three or four dimensions and systematically sampled and assayed and, considering both the tonnage and quality aspects of the ore body, determined to be economically feasible to mine. Probable ore is ore that generally occurs in the periphery of proven ore and *405 has not been determined as exactly as proven ore. Potential ore is a geological estimate of the potential of a particular property. Each of the mines involved in the International programs is a consolidation of contiguous claims of various acreage. Individuals obtained their claims--exclusive rights to develop and mine designated parcels of public land--by registering and recording with the Government. The mines here involved were composed of both patented and unpatented claims. A patented claim usually required proof that a specific amount of ore existed which could be mined profitably at the time of patenting. An unpatented claim was one where no such proof was made. International, a California corporation, was formed in 1981 by Don C. Como (Como). Como had no prior mining experience. Como was engaged primarily in educational film production prior to the inception of the International programs. Theodore Youngquist was hired as mining engineer for the Reward Brown mining property and, later, for the Cassill mining property. He was terminated in 1983. Mervin Lovenberg was retained by International as a consulting geologist. Reward Brown Mines Program
International's *406 first mining program involved the Reward Brown mines, located near Lone Pine, California. Claims for both the Reward Brown mine, formerly known as the Hirsch mine, and the Brown Monster mine were patented in the 1880s. A number of other claims also comprise the mines. These mines are adjacent to or above an underground vein system in a mountain which was sheared along a geologic fault. Together they are known as the Reward Brown Monster group (Reward Brown mine). Mine owners or their lessees have worked the Reward Brown mine at various times since its discovery. At times during an approximate 30-year period before International began activities related to the Reward Brown mine, one Dr. Walter Wilson or his family held varying degrees of ownership in the mine. In 1980, the Reward Brown mine was transferred to Mr. W. Valentine (Valentine). Valentine transferred the Reward Brown mine to his partnership, Missouri Mines, which later became Missouri Mines, Inc. (Missouri Mines). By agreement dated May 18, 1981, Missouri Mines leased the Reward Brown mine to International for a renewable annual term (Reward Brown lease). Como executed the lease for International. The Reward Brown *407 lease provided for renewal as long as International mined at least 100 tons per day. The lease required no rent or royalty for the first 9 months, but starting with the 10th month, a royalty of 10 percent of net production after smelting or $ 3,500 as a minimum monthly payment was required. The Reward Brown lease required International to pay Missouri Mines $ 50 for each unit that International sold, and International agreed "to fund up to $ 750,000 to establish an operating organization" at the mine. The Reward Brown lease stated that International anticipated selling 1,000 to 2,000 units to "individual purchasers, based on a structure that will enable purchasers to shelter their 1981 income". On the same day that the Reward Brown lease was signed, Valentine and International entered into a 1-year "Operating Agreement" which required Valentine to "establish an operating organization to supervise the development of the mining properties". Valentine was to be paid $ 100,000. This operating agreement was never put into effect. The Reward Brown program was described in a "Confidential Private Placement Memorandum" (the Reward Brown brochure) issued by International in 1981. The *408 Reward Brown brochure described the program as an opportunity to purchase mineral aggregate on a tonnage basis in the property to be mined, gave the history and location of the property, and identified the individuals involved in the program. One Reward Brown brochure stated that 500 units of mineral aggregate were offered for sale. This brochure stated that "accompanying geology and engineering reports" had found evidence of 200,000 tons of ore in one pocket containing .8 ounces of gold and 22 ounces of silver per ton. The total tonnage was estimated to exceed 700,000 tons. A second brochure offered 750 units of mineral aggregate. This brochure stated that "a current geology and engineering report" had found evidence of 200,000 tons of aggregate in one pocket containing .8 ounces of gold and 22 ounces of silver per ton, with a potential of 500,000 tons of aggregate. The total tonnage in this second brochure was estimated to exceed 1,300,000 tons of mineral aggregate. The Reward Brown brochure stated that the purchaser of the mineral aggregate would receive the following benefits: * PROJECTED POTENTIAL RETURN ON CASH--800% in addition to recapture of initial cash. * TAX-FREE *409 INCOME--It is the opinion of our tax consultants that until gold bullion is sold and converted to dollars it is not taxable. * TAX ADVANTAGES--500% leveraged purchase. * LEGAL REPRESENTATION--International Recovery, Inc., retains a distinguished California attorney to answer your legal questions. Also included in the package is an Attorney's opinion letter. * NOT A LIMITED PARTNERSHIP--This is a Schedule C deduction. * HISTORICAL MINE--Located in California and available to visit. This mine was previously closed due to high recovery cost with gold at only $ 35.00 an ounce. * VERIFICATION OF CLAIMS--Recent geology and assay reports; documented claim rights. * SIMPLICITY--All financial and legal requirements will be fulfilled by a group with over seven successful years of experience in tax-advantageous business ventures. The Reward Brown brochure also included an engineering report which evaluated the Reward Brown claims as containing three major veins and one with a pocket of approximately 200,000 tons of gold-silver ore that should average .8 ounces of gold and 22 ounces of silver per ton and that drilling would establish a minimum of 700,000 tons of gold-silver *410 ore that would average .40 ounces of gold per ton. The Reward Brown brochure explained the tax benefits of the program. A purchaser could acquire 1400 tons of mineral aggregate (one unit) for $ 250. If the purchaser decided to execute a mining agreement with International, he paid $ 10,000 to International upon signing and executing a promissory note for $ 40,000 in favor of Lloyd's Insurance Limited in Nassau, Bahamas, to have the unit mined. The Reward Brown brochure indicated that the purported mining costs were fully deductible in the initial year, as demonstrated by sample Federal income tax return (Schedule C) included on the brochure. The Reward Brown brochure also included a computation of the estimated income potential for one unit of mineral aggregate as follows: Estimated Income Potential According to assay reports and engineering surveys, it is believed that a ton of mineral aggregate will have a mineral value of $ 200 in gold. Some of the mineral aggregate might be higher. However, as an overall conservative estimate, the amount of $ 200 per ton shall be used. (This value is based on a market of $ 500 per ounce of gold) EXAMPLE OF ESTIMATED VALUE OF GOLD
ONE TON OF MINERAL AGGREGATE
Gold---$ 200.00
1400 tons at $ 200 per ton
$ 280,000.00
MINING CONTRACT = $ 50,000
(Development Cost)
Deduct:   Cash Down Payment
$ 10,000)
Note
40,000 Interest (estimated
4 years)
16,000 $ 66,000
66,000.00
$ 214,000.00
Deduct: Override (royalty 60%)
-$ 128,400.00
MILLING COST*---Deduct
-$ 5,920.00
(Estimate based on $ 1 a gram on 191 ounces)
Estimated Income in Gold Bullion
$ 79,680.00
Plus Original Cash Down Payment
$ 10,000.00
Total Estimated Income in Gold
$ 89,680.00
*411 The Reward Brown brochure provided that the funds received, including the funding of the notes, would be used, inter alia, for drilling additional shafts and galleries, acquiring and maintaining buildings, and leasing and purchasing equipment necessary to prepare the property for mining. The anticipated completion date for the programs was November 30, 1982. The Reward Brown brochure included the following documents: A Purchase Agreement, an Addendum to Purchase Agreement, a Processed Aggregate Purchase Agreement, a Mining Agreement, a Mining Agreement-Assignment, and a "Full Recourse Promissory Note". The purchase agreement provided as follows: PURCHASE AGREEMENT This agreement entered into this     day of    , 1981 by and between Missouri Mines Inc., hereinafter referred to as seller, and    , hereinafter referred to as buyer. Whereas, the seller has gold mining properties located in the state of California and the buyer desires to immediately purchase     tons of mineral aggregate from said seller and seller agrees to sell said tons of mineral aggregate at the execution of this agreement, subject to the following terms and conditions: 1. The seller *412 will now sell said     tons of mineral aggregate to buyer and buyer shall now pay the sum of two hundred fifty dollars ($ 250) for each 1400 tons, to Missouri Mine Inc. upon signing this agreement, and the buyer shall further pay, as the balance of the purchase price, an override (royalty) of 60% of the net total of all gold and silver mined from said tons of mineral aggregate after deducting the mining development cost plus accrued interest thereon. 2. The buyer shall have full and complete ownership rights of all gold and silver in the entire said tons of mineral aggregate and the buyer has the right to mine the said tons of mineral aggregate himself or he may contract with others to mine the said tons of mineral aggregate. You may contract with International Recovery, Inc. by executing the mining agreement. 3. The said override (royalty) can be paid in gold bullion. 4. It is agreed by the seller and the buyer that the override (royalty) shall apply and be calculated on the gold and silver remaining after deducting all development, interest, mining and processing costs. 5. The buyer shall have reasonable access to his property at all times, and he will in turn grant *413 reasonable access to other property owners. 6. It is agreed by both the seller and the buyer that if the buyer contracts with a mining company to mine buyer's mineral aggregate that the buyer will give an assignment to the mining company to deduct the said 60% override (royalty) from the net gold and silver after deduction of all development, interest, mining and processing costs as stated above and said override (royalty) shall be paid in gold and silver bullion. 7. It is agreed by the seller and the buyer that all mining operations of the said tons of mineral aggregate will be completed not later than six years after date herein. 8. Execution hereof by the seller is an acknowledgement and representation relied upon by buyer as a part of the consideration thereof that deposits of ore or other minerals are shown to exist in sufficient quantity and quality to reasonably justify commercial exploitation. Note assay reports. 9. A bill of sale for the said tonnage and date purchased will be furnished to each purchaser. This said particular aggregate is his legal property and will be recorded in the purchaser's name. 10. Buyer agrees to develop the aggregate expeditiously. Buyer *414 further agrees to enter into, and commit payment for, an agreement for development and mining with a mining operator prior to November 30, 1981, unless the buyer agrees to expeditiously develop and mine the aggregate personally. In an addendum to the purchase agreement, International/Missouri Mines reserved the right to make substitutions of mineral aggregate. Where the purchaser engaged International as his mining contractor, International would agree under the Processed Aggregate Purchase Agreement to repurchase the mineral aggregate, after processing, for $ 1.50 per ton. Provisions for the payment of mining costs of $ 50,000 per unit ($ 10,000 in cash and $ 40,000 by promissory note) were contained in the Mining Agreement: This agreement entered into this     day of     1981 by and between International Recovery, Inc., hereinafter referred to as miner, and     hereinafter referred to as principal. Whereas the principal desires the miner to do the mining and development of his     tons of mineral aggregate at the Missouri Mine-Reward-Brown Monster, and the miner agrees to perform such mining and development of said     tons of mineral aggregate, subject *415 to the following terms and conditions: 1. The principal agrees to pay the miner for development the sum of $     as follows: a. The principal agrees to pay the sum of $     at the execution of this agreement as initial payment. b. At the signing of this agreement, the principal agrees to execute a note in favor of Lloyd's Insurance Limited in the amount of $     for financing the balance of the cost of said mining operation. Miner warrants by execution hereof that Lloyd's Insurance Limited is an independent organization with no interest, other than an interest as a creditor, in the mining activity contemplated by this mining agreement. c. The principal agrees that said promissory note shall be due and payable ten years after date of this agreement and that said note shall bear simple interest at the rate of 10% per annum. d. For mining costs, the principal further agrees to pay the miner $ 1.00 (one dollar) per gram of principal's gold extracted * * * * 2. The principal requests the miner to deduct from the total of the gold and silver mined, the promissory note in the amount of $    , plus interest for the account of Lloyd's Insurance Limited. * * *416 * 3. The principal declares that he/she has a 60% override (royalty) agreement with International Recovery Inc. - Missouri Mine, and the principal requests that the miner, after deducting all mining costs * * * shall further deduct 60% of the remainder of said gold and silver for the account of International Recovery Inc. - Missouri Mine as payment of override (royalty). * * * 4. Miner agrees to complete all development work of principal's aggregate within 12 months. * * * 6. The initial phase of mining will not begin until after 150 feet of tunneling has been completed. No aggregate will be processed for purchasers during the initial phase of development. * * * 7. The miner agrees to complete all mining operations not later than six years after date of this agreement. This document in the Reward Brown brochure entitled Mining Agreement--Assignment provided that the purchaser of mineral aggregate could assign to International the right to deduct the amount of the promissory note plus interest and remit the same in gold and silver bullion to the account of Lloyd's Insurance Limited. Mr. Como understood that Lloyd's Insurance Limited (Lloyd's) was a publicly traded *417 entity formed in Nassau in 1979. He located Lloyd's through a business associate, one Don Fikes. The promissory notes executed by the purchasers of mineral aggregates provided in most instances that the principal was payable in 10 years, with simple annual interest of 10 percent. Although petitioners in these cases were generally billed for interest due, none of the petitioners paid the interest and no action was taken against any petitioner for nonpayment of the interest. An unspecified number of such notes were never funded. International made payments in excess of $ 1,000,000 to Lloyd's in the period from November 1981 to August 1982. In a note to financial statements prepared in 1984 for International it is stated that International expected to collect approximately $ 40,000,000 from recourse notes signed by principals to Lloyd's. Cassill Mine Program
International's second mining program involved the Cassill mining claims (the Cassill mine) located in El Dorado County, California. The Cassill mine, which was a placer mine, consisted of a number of mining claims which were made by various individuals in the first half of this century. In 1958, one Blanche Cassill *418 had placer claims patented. In 1970, the mine was transferred to Robert and Patricia Perona (Peronas). By agreement dated June 22, 1982, the Peronas leased the Cassill mine to International for an initial term ending January 31, 1983, for $ 10,000. The lease was executed for International by one Jack A. Whitley, II (Whitley), an International executive. International had the option to renew the lease for a 2-year term upon payment of $ 90,000. International also had the option to extend the lease for additional terms. By agreement dated July 12, 1982, International agreed to surrender the Cassill mines lease, and by agreement dated July 12, 1982, the Peronas leased the Cassill mine to Cassill Mines, a California corporation. Mr. Whitley executed this lease as president of Cassill Mines. Mr. Whitley had no mining background when he became president of Cassill Mines. The new lease was substantially similar to the lease of June 22, 1982. The initial lease term rental was reduced to $ 250. Under the lease, Cassill Mines agreed to pay the Peronas 10 percent of the adjusted monthly gross income from the mining of the claims. On the same date, Cassill Mines and International *419 entered into a mining licensing agreement which provided in part as follows: 1. CASSILL agrees that it will recommend INTERNATIONAL as the prefered [sic] miner for the Cassill Mining Project. In this connection, INTERNATIONAL shall cause to be prepared a Memorandum Brochure which CASSILL will make available to prospective purchasers of mineral aggregate. 2. CASSILL acknowledges that INTERNATIONAL may enter into separate Standard Mining Agreements with certain of those individuals who have purchased and will purchase units of mineral aggregate from the Claims. The Cassill program was described in private placement memoranda. Except for a few modifications, together with information which necessarily differed between mines (e.g. information regarding the location, physical properties of the mines, offering periods and time schedules), these brochures and their accompanying documents were substantially similar to the Reward Brown brochure and its documents for 1981. However, the Addendum to Purchase Agreement (whereby the mine retained the right to substitute other property for any specific property purchased by an investor) and Purchase Agreement were combined as one document *420 in the 1982 and 1983 Cassill brochures. In the 1983 Cassill brochure, the address for Lloyd's Insurance Limited was shown as Grand Turk, Turks and Caicos Islands, B.W.I., while the 1982 address was shown as Nassau, Bahamas. The Cassill private placement memoranda described the program as an opportunity to purchase mineral aggregate on a cubic yard basis. One unit in the Cassill program was comprised of 2,000 cubic yards of mineral aggregate. Each unit sold for $ 300, processing costs were $ 4 per cubic yard, and repurchase of the aggregate under a Processed Aggregate Purchase Agreement was $ .50 per cubic yard. A contract was offered to purchasers for the development and mining of the mineral aggregate at $ 50,000 per unit. The mining agreement required a cash payment of $ 10,000 and a promissory note for the balance of $ 40,000 payable to Lloyd's Insurance Limited. Cassill mines had the right to substitute the purchaser's mining property for other property of the same or better caliber. International was authorized to deduct from the income from the gold and silver mined the principal and interest due on the Lloyd's promissory note, a 60 percent royalty on the gold and silver *421 mined, and the milling costs of $ 4 per cubic yard of aggregate. The Cassill private placement memoranda explained that the purchaser of the mineral aggregates would receive the following benefits: *PROJECTED POTENTIAL RETURN ON CASH - 700% including recapture of initial cash. TAX-FREE INCOME - It is the opinion of our tax consultants that until gold bullion is sold and converted to dollars it is not taxable. *TAX ADVANTAGES - 500% leveraged purchase. *LEGAL REPRESENTATION - International Recovery, Inc., retains a distinguished California attorney to answer your legal questions. Also included in the package is an attorney's opinion letter. *NOT A LIMITED PARTNERSHIP - This is a Schedule C deduction. *HISTORICAL AREA - Located in California and available to visit. The immediate surrounding area produced revenue of over $ 500,000,000 from gold, based on $ 500 per ounce. *VERIFICATION OF CLAIMS - Recent geology and assay reports: documented claim rights. *SIMPLICITY - All financial and legal requirements will be fulfilled by a group with over seven successful years of experience in tax-advantageous business ventures. Each purchaser was required to select a *422 mining contract or to perform the development work or perform such work himself. A tax opinion letter in each brochure concluded that a purchaser's mining development costs were fully deductible in the year of purchase. Each brochure included the following estimated income potential for each cubic yard of mineral aggregate: One cubic yard of mineral aggregate $ 120 2,000 cubic yards at $ 120 per cubic yard . . . $ 240,000 Mining Contract = $ 50,000 (Development Cost) Deduct: Cash Down Payment
$ 10,000
Note
40,000
Interest
16,000
(estimated 4 years)
**Processing (milling cost)
8,000
$ 74,000
74,000
$ 166,000
Deduct: Override (60% royalty)
99,600     Estimated Income in Gold Bullion
66,400     Plus Original Cash Down Payment
10,000     Total Estimated Income in Gold
$ 76,400
The value of $ 120 per cubic yard was based upon "government reports and engineering surveys". One of the Cassill private placement memoranda indicated an offering of 300 units of 2,000 cubic yards of mineral aggregate in the Cassill program. The memorandum anticipated another 100,000 cubic yards of mineral aggregate would be confirmed *423 and certified, making it possible to offer an additional 50 units. A second private placement memorandum offered 1,000 units of 2,000 cubic yards of mineral aggregate. This second memorandum also stated that "accompanying geology and engineering reports" had found evidence of 2,000,000 cubic yards of ore. Both memoranda contained a report by geologist Roy C. Austin dated June 1, 1982. Mr. Austin's report stated that field work done on the Cassill claims had shown that there were 500,000 cubic yards of gravel left to be mined. The Cassill private placement memoranda also contained a letter dated July 16, 1982, from geologist Mervin F. Lovenberg to International. Mr. Lovenberg stated in the letter that the Cassill mining claims contained a minimum of 500,000 cubic yards of gold placer deposits documented by the United States Bureau of Land Management. In a program report issued March 1, 1983, with respect to the Cassill mining program, International reported that it had acquired three items of heavy-duty equipment costing in excess of $ 700,000. In July or August 1983, Mr. Whitley withheld several hundred contracts from International because he was concerned whether there was *424 sufficient mineral aggregate in the Cassill mine to support the purchasers' contracts. He later released them when he obtained an oral agreement from David Pierce that he would make certain that sufficient aggregate would be made available. By letter to Mr. Lovenberg dated October 3, 1983, Mr. Whitley inquired about the amount of proven mineral aggregate available under the existing lease between Cassill Mines and the Peronas and also inquired about the amount of measured, probable, and inferred mineral aggregate available on adjacent properties. By letter to Mr. Whitley dated October 10, 1983, Mr. Lovenberg advised that there were 500,000 cubic yards of mineral aggregate at the Cassill mine. Mr. Lovenberg also stated that another 500,000 cubic yards was inferred in the Cassill mining claims. Mr. Lovenberg also stated that some 500,000 cubic yards of measured aggregate and some 200,000 cubic yards of indicated ore existed on adjacent property not involved in the Cassill mining claims. By letter to International dated October 27, 1983, Mr. Whitley formally notified International that he would enter no further agreements to sell mineral aggregate from the Cassill mining program. *425 Subsequently, International acquired a lease on the Tiedeman mining claims. Mr. Como proposed to transfer units of mineral aggregate in the Tiedeman mines to cover any shortfall to purchasers in the programs. Prior to November 21, 1983, International sold 70 more units in the Cassill mining program. Mr. Whitley learned of these sales and by letter to International dated November 21, 1983, he revoked International's license to mine the Cassill mining claims. Litigation ensued, and work was continued by International on the Cassill mining program for a limited period. Tiedeman Mine Program
The third gold mining program operated by International involved the Tiedeman mine, a placer mine located in El Dorado County, California, some 4 miles south of the Cassill mining claims. Pursuant to a lease agreement dated November 4, 1983, the Tiedeman mine property was leased by International Recovery Development Corporation from one Maurice S. Indursky of New York Stone and Mineral Company. The lease was for a period of 1 year, with an option to renew for additional periods. An employee of International was president of International Recovery Development Corporation. The Tiedeman *426 mine consisted of portions of three parcels of patented claims. The Tiedeman mine offering consisted of 1,000 units of mineral aggregate. Pursuant to the private placement memorandum purchasers were offered a 2,000-cubic-yard unit of mineral aggregate in the Tiedeman mine for $ 300 per unit, with an obligation to pay a royalty of 60 percent of the total gold and silver bullion produced from the mineral aggregate after deducting all mineral costs. Purchasers could select a mining contractor from a list which included International. One of the Tiedeman mine private placement memoranda prepared for use in this mining program stated that a purchaser of mineral aggregate would receive the following benefit: PROJECTED POTENTIAL RETURN ON CASH -- 700% including recapture of initial cash. TAX-FREE INCOME -- It is the opinion of our tax consultants that until gold bullion is sold and converted to dollars it is not taxable. TAX ADVANTAGES -- 500% leveraged purchase. LEGAL REPRESENTATION -- International Recovery Inc. retains a distinguished California attorney to answer your legal questions. Also included in the package is an attorney's opinion letter. NOT A LIMITED PARTNERSHIP *427 -- This is a Schedule C deduction. HISTORICAL AREA -- Located in California and available to visit. The immediate surrounding area produced revenue of over $ 500,000,000 from gold, based on $ 500 per ounce. VERIFICATION OF CLAIMS -- Recent geology and assay reports: documented claim rights. SIMPLICITY -- All financial and legal requirements will be fulfilled by a group with over seven successful years of experience in tax-advantageous business ventures. One of the private placement memoranda used in the Tiedeman mining program outlined the following estimated income potential to purchasers of a unit of mineral aggregate: ESTIMATED INCOME POTENTIAL Based on geological and engineering reports and 14 core drillings with results completed in 1984, it is believed that a cubic yard of mineral aggregate will have a value in excess of $ 175 in gold, based on .5% gold per cubic yard. Some of the mineral aggregate may be higher. However, as an overall estimate, the amount of $ 175 per cubic yard will be used. (This value is based on the value of gold at $ 350 per ounce.) * * * Deduct:
Initial Cost of Aggregate
$    300
Cash Down Payment
10,000
Note (Full Recourse)
40,000
Interest On Note (10%)
16,000
(estimated 4 years)
Processing & Milling Costs
30,000
Total Development Costs
$ 96,300
$ 96,300
Gross Income After Principal's Development
Costs Are Paid
$ 254,700
Deduct: Override (60% of net gold mined)
$152,820
(Tiedeman's Royalties)
Principal's Estimated Income In Gold Bullion
$101,880
*428 Another Tiedeman mine placement memorandum used a value of gold at $ 120 per cubic yard (based upon gold at $ 450 an ounce) in computing the estimated income potential which resulted on projected total estimated income of $ 76,400. One of the Tiedeman mine private placement memoranda stated that "the accompanying geology and engineering reports" found evidence of 2,500,000 cubic yards of aggregate. Another Tiedeman mine private placement memorandum stated that the "accompanying geology and engineering reports" found evidence of 2,500,000 cubic yards of ore. A two-page geological report prepared by geologist R. W. McComas which was included in the Tiedeman mine private placement memoranda, concluded that the potential reserves contained within the bounds of Tiedeman mine property could amount to approximately 2,500,000 cubic yards of placer material. The report also stated that the value of this placer material would be difficult to predict. The report further stated that an average value of .30 ounces per cubic yard of placer material seemed feasible. Finally, the report recommended that an exploratory program be conducted to ascertain the exact location, extent and configuration *429 of the subsurface channel. Petitioner John W. Rutland, who previously had acquired an interest in a program called the Alitolia mining program, transferred such interest to the Tiedeman mine promotion in 1984. On August 2, 1984, he made a payment of $ 5,000 to International. Securities and Exchange Commission and Department of Justice Complaints
On September 27, 1985, the Securities and Exchange Commission (SEC) filed a complaint against International and Mr. Como in the United States District Court for the Central District of California. International and Mr. Como consented to an order of permanent injunction. The consent decree entered March 1986 provided, in pertinent part, that International would not: (a) Sell any security of International Recovery or any other security, unless a registration statement is in effect with the SEC as to such security or an exemption from registration is applicable; (b) offer to buy or sell any International Recovery or other security through a brochure or otherwise unless a registration statement is in effect or an exemption is applicable; (c) make or obtain money or property by making untrue statements of material facts or omitting *430 necessary material facts concerning: 1. The use of proceeds from the sale of any such security; 2. the quantity of gold and silver available to be mined by the issuer of said security; 3. the prospects for obtaining substantial tax benefits by investing in any such security; and 4. the existence of third party loans to investors buying any such security; (d) employing any device, scheme or artifice to defraud or engaging in any transaction, act, practice or course of business which operates or would operate as a fraud or deceit against any person by distributing materially false or misleading documents, including, among other items, offering memoranda, and engaging in the purchase or sale of any such security in contravention of section 17(a) of the Securities Act of 1933, ch. 38, tit. I, 48 Stat. 74, 84 and of section 10(b) of the Securities Exchange Act of 1934, ch. 404, tit. I, 48 Stat. 881, 891 or Rule 10b-5 thereunder. The Department of Justice also filed a complaint for injunctive relief in the Central District of California against Mr. Como and International. Pursuant to a consent order signed by Mr. Como and International, a final judgment of permanent injunction was *431 entered in January 1986. The final judgment of permanent injunction enjoined Mr. Como and International from: a. Taking any action in furtherance of the organization, promotion, advertising, marketing, or selling of the Tax Shelters; b. Representing that investors in the Tax Shelters will be entitled to deductions for Federal income tax purposes, including deductions for mine development expenditures and from furnishing or distributing materials, and oral or written information, which so indicate; c. Organizing or assisting in the sale of * * * [a] plan * * * in which i. False or fraudulent statements are made with respect to [the] deductibility of mine development expenses; ii. False or fraudulent statements are made with respect to the existence of financing by a third party; iii. False or fraudulent statements are made with respect to the use of funds for mine development; iiii. False or fraudulent statements are made with respect to the expectation of profit in gold mining programs; v. Gross valuation overstatements are made with respect to the value of ore contained in a mining claim * * * Petitioners' Involvement with the Programs
Petitioner *432 Lavonne M. Wann (Mrs. Wann) executed a purchase agreement dated December 28, 1981, for 1,050 tons of mineral aggregate in the Reward Brown mining program. She also executed additional documents relating to her participation in the Reward Brown mining program. She paid $ 187.50 to Missouri Mines for the mineral aggregate, made a payment of $ 7,500 to International and executed a promissory note payable to Lloyd's for $ 30,000. She executed another purchase agreement dated July 7, 1982, for 3,150 tons of mineral aggregate in the Reward Brown mining program. She paid $ 562.50 to Missouri Mines for the mineral aggregate, executed a 90-day promissory note payable to International in the amount of $ 22,500, and also executed a promissory note payable to Lloyd's in the amount of $ 89,500. Mrs. Wann entered into the July 7, 1982, transaction pursuant to a joint venture agreement of the same date with Marilynn Vesely, Donald D. Fink and Terri Fink, and Charles H. Merrill and Bernadette Merrill. Mrs. Wann's interest in the joint venture was four-ninths, which equaled 1,400 tons (one unit) of mineral aggregate. Mrs. Wann also executed a purchase agreement dated December 13, 1982, for 2,000 *433 cubic yards of mineral aggregate in the Cassill mining program. She paid $ 300 to Cassill mines for the mineral aggregate, made a payment (on February 4, 1983) to International in the amount of $ 10,116.45 in satisfaction of a 90-day promissory note executed on December 13, 1982, and executed a promissory note payable to Lloyd's in the amount of $ 40,000. Mrs. Wann executed an additional purchase agreement dated May 20, 1983, for 2,000 cubic yards of mineral aggregate in the Cassill mining program. She also received 100 cubic yards of mineral aggregate as a bonus. She paid $ 300 to Cassill mines for mineral aggregate. She also made a payment (by check dated May 20, 1983) of $ 5,125 to International, executed a 90-day note (dated May 20, 1983) payable to International in the amount of $ 4,875, and executed a promissory note payable to Lloyd's in the amount of $ 40,000. Mrs. Wann claimed Schedule C deductions for mining development expenses on her 1981, 1982, and 1983 Federal income tax returns in the respective amounts of $ 37,500, $ 100,000, and $ 50,000. Respondent disallowed the deductions in full. Petitioner James B. Hodges executed a purchase agreement on November 19, *434 1981, for 1,400 tons of mineral aggregate in the Reward Brown mining program. He paid $ 250 to Missouri Mines for the aggregate. He also paid $ 10,000 to International and purportedly executed a promissory note for $ 40,000. Mr. Hodges claimed a Schedule C deduction for mine development costs in the amount of $ 50,000 on his 1981 Federal income tax return. Respondent disallowed the deduction in full. In December 1981, petitioner John W. Rutland purchased 700 tons of mineral aggregate in the Reward Brown mine. He paid $ 125 to Missouri Mines for the aggregate. He also made a payment of $ 5,000 to International by check dated December 19, 1981, and also executed a promissory note payable to Lloyd's in the amount of $ 20,000. Mr. Rutland claimed a Schedule C deduction for mining development costs in the amount of $ 25,000 on his 1981 Federal income tax return with respect to his participation in the Reward Brown mining program. Respondent disallowed the deduction in full. Mr. Rutland claimed an interest expense deduction on Schedule C of his 1984 Federal income return in the amount of $ 5,000. The Schedule C activity was identified as the Tiedeman mining program. The $ 5,000 *435 interest deduction was the only item appearing on Schedule C. Respondent disallowed the deduction in full. Petitioner A. Gordon Keyes, Jr. executed a purchase agreement on July 7, 1982, for 1,400 tons of mineral aggregate in the Reward Brown mine. He paid $ 250 to Missouri Mines for the mineral aggregate, made a payment of $ 2,000 to International and another payment in the amount of $ 8,240 to International, and executed a promissory note in the amount of $ 40,000 payable to Lloyd's. Mr. Keyes claimed a Schedule C deduction for mining development costs in the amount of $ 50,000 on his 1982 Federal income tax return with respect to his participation in the Reward Brown mining program. Respondent disallowed the deduction in full. In 1983 petitioner Charles H. Merrill purchased a quantity of mineral aggregate in the Tiedeman mine program for $ 150. In connection with this purchase, he also made a payment of $ 5,000 to International and executed a promissory note in the amount of $ 20,000. Mr. Merrill claimed a Schedule C deduction for mining development costs in the amount of $ 25,000 on his 1983 Federal income tax return with respect to his participation in the Tiedeman mining *436 program. Respondent disallowed the deduction in full. Petitioner Stanley M. Riffe executed a purchase agreement on July 6, 1982, for 1,400 tons of mineral aggregate in Reward Brown mine, paying $ 250 to Missouri Mines. He also made a down payment to International which included a 90-day note payable to International in the amount of $ 8,320 and a cash payment of $ 2,000. He also executed a promissory note payable to Lloyd's in the amount of $ 40,000. On December 20, 1982, Mr. Riffe executed a purchase agreement for 1,000 cubic yards of mineral aggregate in the Cassill mining program, paying $ 150 to International. He also made a payment to International in the amount of $ 5,000 and executed a promissory note payable to Lloyd's in the amount of $ 20,000. Mr. Riffe claimed a Schedule C deduction for mining development costs on his 1982 return with respect to the Reward Brown mining program ($ 37,500) and the Cassill mining program ($ 25,000) in the total amount of $ 62,500. Respondent disallowed the deductions in full. Petitioner Wilbur L. Rigmaiden executed a purchase agreement on or about December 28, 1981, for 700 tons of mineral aggregate in the Reward Brown mining program. *437 He paid $ 125 to Missouri Mines for the aggregate. He also made a payment of $ 5,000 to International by check dated December 28, 1981, and executed a promissory note payable to Lloyd's in the amount of $ 20,000. Mr. Rigmaiden executed a second purchase agreement dated July 7, 1982, for 700 tons of mineral aggregate in the Reward Brown mine. He paid $ 125 to Missouri Mines for the aggregate. He also agreed to pay the sum of $ 5,000 as an initial payment upon execution of the purchase agreement and to execute a note in favor of Lloyd's in the amount of $ 20,000. Mr. Rigmaiden claimed Schedule C deductions for mining development expenses with respect to the Reward Brown program in the amount of $ 25,000 in each of the taxable years 1981 and 1982. Respondent disallowed the deductions in full. Petitioner Per T. Ron executed a purchase agreement dated December 31, 1981, for 1,750 tons of mineral aggregate in the Reward Brown mining program. He paid $ 312.50 to Missouri Mines for the mineral aggregate. He also made a payment of $ 12,500 to International and executed a promissory note payable to Lloyd's in the amount of $ 50,000. On July 7, 1982, Mr. Ron purchased 1,400 tons of *438 mineral aggregate in the Reward Brown mining program. In connection with this transaction, he paid $ 250 to Missouri Mines for the mineral aggregate, paid $ 10,296 to International, and executed a promissory note payable to Lloyd's in the amount of $ 40,000. On December 13, 1982, Mr. Ron purchased 1,000 cubic yards of mineral aggregate in the Cassill mining program. He paid $ 150 to Cassill Mines for the mineral aggregate, made a payment of $ 5,000 to International, and executed a promissory note payable to Lloyd's in the amount of $ 20,000. On February 10, 1983, Mr. Ron purchased 2,000 cubic yards of mineral aggregate in the Cassill mining program. In connection with the transaction, he paid $ 300 to Cassill mines for the mineral aggregate, made payments of $ 10,213.04 to International, and executed a promissory note payable to Lloyd's in the amount of $ 40,000. On May 16, 1983, Mr. Ron purchased 1,000 cubic yards of mining aggregate from Cassill mines. In connection with this transaction, he paid $ 150 to Cassill mines for the mineral aggregate, made payments to International in the amount of $ 5,080, and executed a promissory note payable to Lloyd's in the amount of $ 20,000. *439 On July 18, 1983, Mr. Ron purchased 1,000 cubic yards of mineral aggregate from Cassill mines. In connection with the transaction, he paid $ 150 to Cassill mines for the mineral aggregate, paid $ 5,000 to International, and executed a promissory note payable to Lloyd's in the amount of $ 20,000. Mr. Ron claimed Schedule C deductions for mining development expenses with respect to his participation in the above-described mining programs in the taxable years 1981, 1982, and 1983 in the respective amounts of $ 62,500, $ 75,000, and $ 100,000. Respondent disallowed the deductions in full. Petitioner Richard F. Standfest executed a purchase agreement dated December 11, 1982, for 6,000 cubic yards of mineral aggregate in the Cassill mining program. He paid $ 900 to Cassill mines for mineral aggregate, made a payment of $ 30,000 to International and executed a promissory note payable to Lloyd's in the amount of $ 120,000. Mr. Standfest also executed a purchase agreement dated September 8, 1983, for 3,000 cubic yards of mineral aggregate in the Cassill mining program. He paid $ 450 to Cassill mines for the mineral aggregate, made a payment of $ 15,000 to International and executed *440 a promissory note payable to Lloyd's in the amount of $ 60,000. Petitioners Richard F. Standfest and Lucinda D. Standfest claimed Schedule C deductions for mining development expenses on their 1982 and 1983 Federal income tax returns in the respective amounts of $ 150,000 and $ 75,404. Respondent disallowed the deductions in full. Dr. Jolinda A. Traugh executed a purchase agreement dated December 28, 1981, for 1,050 tons of mineral aggregate in the Reward Brown mining program. She made a payment of $ 182.50 to Missouri Mines for the mineral aggregate, made a payment of $ 7,500 to International, and executed a promissory note payable to Lloyd's in the amount of $ 30,000. She also executed a purchase agreement dated July 7, 1982, for 2,100 tons of mineral aggregate in the Reward Brown mining program. She paid $ 375 to Missouri Mines for the mineral aggregate, made a payment of $ 15,000 to International, and executed a promissory note payable to Lloyd's in the amount of $ 60,000. Dr. Traugh claimed Schedule C deductions for mining development expenses with respect to her participation in the above-described mining venture on her 1981 and 1982 Federal income tax returns in the *441 respective amounts of $ 37,500 and $ 75,000. Respondent disallowed the deductions in full. Petitioner Clione M. Vesely and her brother, Donald D. Vesely, executed a purchase agreement dated December 26, 1982, for 1,000 cubic yards of mineral aggregate in the Cassill mining program. She paid $ 75 to Cassill mines for the mineral aggregate, made a payment of $ 2,500 to International and, together with her brother, executed a promissory note payable to Lloyd's in the amount of $ 20,000. She executed another purchase agreement dated May 9, 1983, for 1,500 cubic yards of mineral aggregate from the Cassill mining program. She paid $ 225 to Cassill mines for the mineral aggregate, made payments of $ 5,090 to International, and executed a promissory note payable to Lloyd's in the amount of $ 20,000. Clione M. Vesely claimed Schedule C deductions for mining development costs on her 1982 and 1983 Federal income tax returns in the respective amounts of $ 12,500 and $ 25,000. Respondent disallowed the deductions in full. OPINION During the years at issue, petitioners in these cases claimed mining development expenses purportedly generated from their participation in three gold-mining *442 programs promoted by International: the Reward Brown mining program, the Cassill mining program, and the Tiedeman mining program. Most of the petitioners were involved in the Reward Brown and the Cassill programs. The programs were similarly packaged. For a minimal sum, a participant acquired a unit of mineral aggregate in the particular mine measured either in tonnage or in cubic yards of aggregate. A cash payment would be made to International together with a promissory note in favor of Lloyd's, an off-shore entity, and the total cash payment and the face amount of the note would be claimed in full as a mining development expense in the initial year of participation in the program. Even though the program highlighted the available deductions as mining development expenses, petitioners now belatedly contend, in the alternate, that the amounts claimed on their returns are deductible as mining exploration expenses. Respondent contends that the International mining programs were shams devoid of economic substance and that the transactions were not engaged in with the requisite profit objective, and, hence, the deductions are not allowable under either of the theories propounded *443 by petitioners. Petitioners have the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). To qualify under section 616(a), the expenditures must have been paid for the development of a mine or other natural resource (other than an oil or gas well) after the existence of ores or minerals in commercially marketable quantities has been disclosed. To qualify under section 617(a), the expenditures must have been paid for the purpose of ascertaining the existence, location, extent or quantity of ore or other mineral before the beginning of the development stage of the mine. However, for the deduction to be allowable under either section 616(a) or 617(a), the activity giving rise to the expenditure must constitute an activity engaged in by petitioners with the actual and honest objective of making a profit. Horn v. Commissioner, 90 T.C. 908, 932-933 (1988); Patin v. Commissioner, 88 T.C. 1086, 1117 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. without published opinion Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub *444 nom. Skeen v. Commisioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1939). It is well established that a transaction entered into solely for tax consequences will not be given effect for Federal income tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Knetsch v. United States, 364 U.S. 361, 366 (1960); Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983). A transaction will be recognized, however, if it has economic substance. Estate of Thomas v. Commissioner, 84 T.C. 412 (1985). In deciding whether a transaction has any practical economic effect other than the creation of tax benefits, the consideration of both business purpose and economic substance is relevant to the inquiry. Collins v. Commissioner, 857 F.2d 1383 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), *445 affg. Brown v. Commissioner, 85 T.C. 968 (1985). We have examined the voluminous record in searching for the requisite business purpose on the part of the several petitioners here involved, and we conclude that a sufficient business purpose simply did not exist. Initially, we note that many of the petitioners herein learned about the International mining program through Mrs. Wann, who is also a petitioner here, and in large part relied upon her for information about the programs. At the time of the trial Mrs. Wann, a public accountant, did part-time work preparing tax returns and handling audits. She is an enrolled agent authorized to represent clients before the Internal Revenue Service. Mrs. Wann, in past years, had operated a tax service and bookkeeping service. She sold the bookkeeping practice in 1980. In addition, Mrs. Wann has operated rental properties and has invested in stock including mining stock. She also owns an interest in some 40 mining claims in Nevada. She visited the Reward Brown mining property in or about October 1981 and obtained information about the mines from individuals involved with the mining program. She subsequently obtained *446 the Reward Brown private placement memorandum. She contacted one David Pierce with respect to the legal opinion he had prepared for the private placement memorandum. There is no evidence to show that she made any serious effort to make an independent verification of the information she obtained about the mining program. She relied largely on the individuals associated with the mining program, including Dr. Como who was president of International Recovery. Mrs. Wann also visited the Cassill mine property at some point in 1982. Mrs. Wann has never paid any interest on the promissory notes payable to Lloyd's. She understood that the notes were payable from the proceeds of any gold that was mined from her mineral aggregate before the due date of the notes. She was aware of the engineering report dated April 20, 1981, evaluating the Reward Brown mining property. The report, which was included as part of the Reward Brown private placement memorandum, indicated the existence of a pocket of some 200,000 tons of gold-silver ore that would average .8 ounces of gold and 22 ounces of silver per ton and that further drilling would contact ore in "appreciable amounts". She also testified *447 that, upon inquiry, she was informed by the program's mining engineer that at least 1,500,000 tons of ore existed in the Reward Brown mining property. Although she testified that she discussed the feasibility of the Reward Brown mining program with several individuals, it appears from the record that such individuals included a broker, an attorney, and two certified public accountants. It does not appear that such individuals had backgrounds in mining. In making her Cassill mining program investments, Mrs. Wann relied upon a report prepared by geologist Mervin F. Lovenberg. She was unsure how the notes would be paid if no gold was produced, stating that "I haven't had to cross that bridge." She did not know who held the promissory notes at the time of the trial. She made no effort to verify her title in the mineral aggregate she acquired from Missouri Mines. When she invested in the Cassill mining program toward the end of the year 1982, no gold had been mined there. She testified that, as of the date of the trial, it was her understanding that at least one unit of aggregate had been processed. Most of the petitioners in these cases were friends or relatives of Mrs. Wann. *448 Petitioner James B. Hodges was introduced to the Reward Brown mine program by a business associate who had purchased a unit in the program. Mr. Hodges had no prior experience in mining investments. Nor did he have any previous mining experience. Mr. Hodges reviewed the private placement memorandum with his accountant. He made no effort to have an attorney or a geologist review any of the documents in the placement memorandum. Mr. Hodges visited the mine site before he made his purchase and observed some equipment there. He discovered that all operations were shut down on the occasion of his second visit to the mine site in May or June, 1982. On his third visit to the mine site in September 1982 he observed equipment and machinery in operation. Mr. Hodges was unaware of the location or specifics of the mineral aggregate which he purchased. Mr. Hodges understood that his $ 40,000 note was to be paid from the proceeds of the sale of the mineral aggregate. He had "no idea" as to who would receive the proceeds from the note. He testified that in any event he did not intend to pay the note. Mr. Hodges did not know when his mineral aggregate would be mined. He did not know how *449 many units were sold in the Reward Brown mine and stated that it made no difference to him. Petitioner John W. Rutland, who entered the Reward Brown mining program in December 1981, did not visit the Reward Brown mine in that year. He testified that his return preparer reviewed the Reward Brown private placement memorandum. In making his purchase of mineral aggregate in 1981, Mr. Rutland relied primarily on the material included in the private placement memorandum. He testified that he would not pay the promissory note he had executed in favor of Lloyd's unless he received his ore. Mr. Rutland also made other mining investments in 1980, 1982, and 1983 which also provided him with deductions with a ratio of five to one to his cash investment. The 1982 and 1983 investments were with an entity called Alitolia mines, with financing evidenced by notes in favor of an entity called Columbia Financial. In 1984, Mr. Rutland was offered an opportunity to transfer his two units from Alitolia mines to the Tiedeman mining program upon making an "interest payment". Accordingly, Mr. Rutland made a payment of $ 2,500 to International for each of his two units, or a total of $ 5,000, in or *450 about August 1984. As a consequence of the transfer of the two units, he received 2,000 cubic yards of mineral aggregate in the Tiedeman mine. Petitioner A. Gordon Keyes, Jr. learned about the Reward Brown mining program from petitioners Wilbur L. and Patricia R. Rigmaiden. He did not visit the mine before making his purchases of mineral aggregate in 1982 but relied upon Mrs. Wann for information about the mining program. He had no prior mining experience. Mr. Keyes' purchase was reviewed by his tax preparer, one Gregory A. Morrison. Although Mr. Keyes testified that his unit in the program would not be substituted for some other unit, the record shows that he executed an addendum to his purchase agreement on July 7, 1982, giving International the right to make a substitution of mining property. Mr. Keyes testified that he had no idea how International intended to use his payments made to International. Although he was billed for interest payments, on the promissory note, he made no interest payments. He testified that he intended to pay the note when "I got my gold". Prior to his purchase of mineral aggregate in the Tiedeman mining program in 1983, petitioner Charles H. *451 Merrill had no mining experience. He never visited the mine in question. His knowledge of the mining transaction was apparently derived from Mrs. Wann, his mother-in-law. Mr. Merrill was completely unfamiliar with the details of the 1983 transaction. He knew nothing about Lloyd's. He has never made any interest payments on his note. Mr. Riffe was not aware of many aspects of the Reward Brown mining program. He did not know the intended recipient of the proceeds of the Lloyd's note. He testified he did not know who held the Lloyd's note at the time of trial. Mr. Riffe was billed for interest on the note but he never made any interest payments. He did not know that his unit in the Reward Brown mine could be substituted for another unit. He did not know what the mining costs per ton were. Mr. Riffe read the Cassill mines private placement memorandum before he made his purchase of mineral aggregate in the Cassill mining program. He also discussed the program with Mrs. Wann. He did not know that his unit in Cassill mines could be substituted for another unit. Mr. Riffe never visited the Cassill mine property. He discussed the Reward Brown mine with an acquaintance, Mrs. *452 Wann. He reviewed the private placement memorandum and discussed the program with Mrs. Wann. He visited the Reward Brown mine in January 1982 and a second time in June 1983. Petitioner Wilbur L. Rigmaiden learned about the Reward Brown mining program from Mrs. Wann. He had no prior mining experience. Apart from his discussions with Mrs. Wann and reading the private placement memorandum, Mr. Rigmaiden made no further inquiries or investigation into the merits of the Reward Brown mining program. He could not identify the seller of the mineral aggregate and did not know the specific units of aggregate that he purchased. Mr. Rigmaiden was not aware that his units could be substituted, even though he had executed agreements to allow such substitution. He did not question the projected mining costs for his mineral aggregate. Mr. Rigmaiden did not pay any interest on the promissory note he executed in connection with his acquisition of mineral aggregate. It was his understanding that the promissory note would be paid from the proceeds of the gold mined from his unit. He testified that he was bound by the note but that he had no intention to pay the note as of the time of the trial, *453 that he would seek legal advice, and that "right now it's hard to say". Petitioner Per T. Ron learned about the Reward Brown mining program from Mrs. Wann. He read the private placement memorandum and discussed the mining program with Mrs. Wann. He also read a general article about the Reward Brown mine which he received from Mrs. Wann. Mr. Ron also visited the Reward Brown mine property at some point. He also visited the Cassill mine property in July 1984, after he acquired his mineral aggregate there. Mr. Ron has never paid any interest on his promissory note. He did not know who held the notes he had executed, and he did not know whether Lloyd's had funded his particular notes. He purportedly intended to pay the notes when gold was mined from his various units of mineral aggregate. He was not aware that his units in the Reward Brown and Cassill mines could be substituted. Petitioner Lucinda D. Standfest testified that she and her husband learned about International in 1982 through Mrs. Wann. She had no prior mining experience and did not visit the Cassill mine property prior to the initial purchase. She read the Cassill mine private placement memorandum prior to making *454 her initial purchase. She testified that "We felt by reading it -- we felt that the mine was commercially profitable." No interest payments were made on the notes executed in part of the participation in the Cassill mining program. She testified that she did not know who held the promissory notes at the time of the trial. She did not know that the units of mining aggregate could be substituted. Dr. Jolinda A. Traugh learned about the Reward Brown mining program from one Sue Robinson who was acquainted with Mrs. Wann and had previously made an investment in the Reward Brown mining program. At some time in December 1981, Dr. Traugh obtained a private placement memorandum which she admitted she did not read very carefully. She made no effort to independently investigate the merits of the mining program. She never made interest payments on the promissory notes even though she had been billed on occasion. She did not know what the funds she advanced to International were used for specifically. Petitioner Clione M. Vesely is Mrs. Wann's sister. She never visited the Cassill mining property where she had purchased mineral aggregate in 1982 and 1983, and she made no effort to investigate *455 the mining program. She relied for the most part on her sister for information regarding the program. She paid no interest on the promissory notes executed by her. She did not know that the mineral aggregate she purchased could be substituted. She could not recall receiving any assay reports with respect to her units of aggregate. In short, the record demonstrates a complete failure by petitioners to make a proper evaluation of the mining programs and a marked indifference to the profit aspects of the various mining programs in which they took part. Their readiness to accept with no apparent reluctance an obligation of a royalty of 60 percent of the total gold and silver bullion produced from their mineral aggregate, their willingness to purchase a unit of mineral aggregate at some undeterminable location, and their willingness to accept the entire International package without negotiation and without questioning the reasonableness of the projected mining costs or the validity of the estimated income potential from their mineral aggregate belie a business purpose on the part of petitioners in entering these transactions. Since it appears from the record that petitioners had *456 little or no prior mining experience, their somewhat casual approach to the economic soundness of their investment strongly suggests that they entered the transactions solely for tax purposes. The focus upon tax benefits heralded in the private placement memoranda describing the mining programs supports this conclusion. Purchasers of mineral aggregates were promised a tax advantage of five to one, and a 6-page tax opinion concluding that the mining development costs were fully deductible in the year in which the purchasers invested in the mining program was included in the private placement memoranda. A schedule showing the deductible development costs keyed to the number of units acquired by a purchaser in a mining program is also featured in the private placement memoranda. Moreover, an analysis of the mining properties as well as the proposed plans to mine the properties is persuasive evidence that the transactions here involved were not realistically conducive to an economic profit. Dr. Charles P. Miller, a consulting geologist in mining geology and mineral exploration, testified as respondent's expert witness. Dr. Miller made a detailed examination of the Reward Brown mine *457 and the relevant mining claims and concluded that no economic or commercially marketable mineralization had been delineated on the Reward Brown mining claims and that no development work had been done by International at the Reward Brown mine. During his extended field examination of the Reward Brown mine, Dr. Miller studied outcrops, prepared a map of the existing tunnels on the property to show the extent of mining, and mapped the geology in the tunnel. He also examined available assay results which indicated that the grade of gold in the area to be mined by International was not economic to mine during the period here relevant. Dr. Miller described the ore deposit at the Reward Brown mine as an epithermal gold system and that economic gold values in a vein system of that type would commonly bottom out. The Reward Brown mines have previously been intermittently mined for many years. Dr. Miller testified that "a lot of what had been originally in that vein system has already been mined out". Commercially marketable ore requires proven or measured ore, which is ore that has been defined in three or four dimensions and has been systematically sampled and assayed and determined *458 to be economically feasible. Dr. Miller took field samples during his field examination of the Brown Reward mine. The assays on such samples ranged from .002 ounces per ton to .610 ounces per ton. Three samples were from older Brown Reward workings and three samples came from the tunnel into the mine constructed by International. Only one sample indicated more than .1 of an ounce per ton or economically viable to mine. Dr. Miller testified that the estimates of some 200,000 tons of ore that appeared in the Reward Brown placement memorandum were estimates of potential ore and not proven ore. Dr. Miller also made a field examination of the Cassill mine property and examined relevant court records to ascertain the status of patented and unpatented claims. Dr. Miller testified at the trial, that on the basis of his field examination and on the basis of patent records from the Bureau of Land Management made available to him after his report on the Cassill mine program was prepared, that there is no commercially marketable ore at the Cassill mine. Finally, Dr. Miller made a field examination of the Tiedeman mine property and examined court records with respect to the patented claims *459 on the property. Based upon his observations on the property and prior geology reports done on the property, Dr. Miller concluded that no commercially marketable ore has been proven or established on the Tiedeman mine property. Dr. Miller noted that although the Tiedeman property had been mined in the past, he was not aware of records that would establish definite grade and tonnage of ore. He further noted that placer deposits are difficult to explore, and proven reserves are verified only after extensive testing. Robert L. Hamilton also testified as respondent's expert witness with respect to the Reward Brown mine program, the Cassill mine program, and the Tiedeman mine program. Mr. Hamilton inspected the Reward Brown mine in December 1982 and examined the tunnel constructed by International which was intended to intersect the vein system of the older mine workings at a higher level. At some later date, International supplied Mr. Hamilton with a plan map displaying the investors' lots with respect to the ore veins on the Reward Brown property. Mr. Hamilton concluded that the map did not reflect the true nature of the vein dips and was misleading. Mr. Hamilton testified that *460 he was unable to find any criteria which showed proven ore beyond the ore workings from prior years. He stated in his report on the Reward Brown mine that he was provided no proof of the estimate 200,000 tons of ore averaging .8 ounces of gold per ton as claimed by International in the relevant Reward Brown private placement memorandum. Mr. Hamilton also inspected the Cassill mine property early in 1984. Virtually nothing had been done in the way of development of the property. Some preparation had been made to construct an underground tunnel and some equipment was at the site. Mr. Hamilton inspected the Tiedeman mine property in mid-1985. Some earth-moving equipment was on the site and it appears that a small amount of the gravel had been exposed and that the trammel was in operation. No data was made available to Mr. Hamilton to indicate the existence of any commercially marketable ore body on the Tiedeman mine property. Mr. Hamilton stated in his report that it was quite obvious during his mid-1985 inspection that the mine openings on the Tiedeman mine property had recently been cut and that the plant had seen little use. Mr. Hamilton also stated in his report that, based *461 upon his observations of the limited amount of aggregate that had apparently been treated at the time of his visit to site, he was not convinced that the Tiedeman mining program was an on-going operation. Mr. Hamilton testified with respect to the Tiedeman mining property that he was not shown any data which at that time indicated the existence of a commercially marketable ore body. In determining the economic feasibility of these transactions, we have also considered the opinions of petitioners' expert witnesses. We do not find such opinions helpful and, in any event, we are not bound by the opinions proffered by expert witnesses. See Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). R. W. McComas, a consulting geologist, testified as petitioners' expert witness. Mr. McComas inspected the Tiedeman gold placer mine property in November 1983 for the purpose of determining the potential gold deposit. His geological report dated November 26, 1983, which was included in the Tiedeman mine private placement memorandum, made no determination *462 of the amount of proven ore or the economic value of the ore in the Tiedeman mine. Mr. McComas was retained to conduct and supervise an exploration program on the Tiedeman mine property from May 5, 1984, to May 15, 1984. His purpose was to determine the extent and amount of gold-bearing gravel in the channel existing on the leased property and to determine the economic value of the deposit. Mr. McComas drilled 14 holes, 8 of which penetrated the channel. Assays of the samples ranged from no trace of gold to 1 ounce of gold per ton. In his 1984 report Mr. McComas estimated that 2,750,000 cubic feet of placer material existed in the Tiedeman property channel. However, he also estimated that only 82,500 tons of potential gold-bearing placer material was available. Mr. McComas, using assays from drill hole samples and taking into consideration the value of historic production of placer deposits in the Sierra, estimated a minimum average value of 0.35 ounces of gold per ton in the area that was drilled. Mr. McComas also noted in his 1984 report that accurate values could only be obtained by large tonnage bulk sampling. Dr. Miller testified that the spacing of the drilling program *463 conducted by Mr. McComas was not a proper sampling method to estimate the commercially marketable ore in the area. Mr. Kent Ausburn, a geologist, also testified as petitioners' expert witness. Mr. Ausburn testified generally as to the factors that may justify exploration for minerals. He inspected the Reward Brown mine site and examined prior reports dealing with the mineralization in the area. He inspected the tunnel in the side of the mountain, but he testified that he "did not really have time to do any kind of real work underground". He concluded that a viable exploration program was being conducted. He was unable to make any estimate of the ore tonnage revealed as a result of the tunneling work undertaken by International. As to the grade of the gold mineralization Mr. Ausburn relying in large part on assays of prior sampling activities, testified that it averaged a little over .1 ounce per ton. He indicated that the results of such assay were well below ore grade materials. He also indicated that the ore produced for the Reward Brown mine during the earlier periods of its main production was in the range of about .5 ounces per ton. A considerable portion of the earlier *464 reports used by Mr. Ausburn on the quality of ore deposits at the Reward Brown mine was based on work done prior to 1940. In his conclusion Mr. Ausburn relied on tonnage figures and ore quality figures contained in the Reward Brown private placement memorandum. We find nothing persuasive in the expert opinion proffered by petitioners' expert witness which would support a finding that the mining programs here at issue offered a realistic profit potential. The lack of any economic validity of the Reward Brown mines is underscored by the testimony of Paul Skinner who had previously mined in the older working at the higher level of the Reward Brown mines. He testified that he stopped mining because it was not economical. He testified that to his knowledge no one seriously mined the property between 1956 and the date it was leased by International. Mr. Skinner had also assayed several hundred samples for International from the Reward Brown property and never found anything that exceeded .1 ounces per ton. With respect to the engineering report in the Reward Brown private placement memorandum estimating a pocket of 200,000 tons of ore that should average .8 ounces of gold per ton, *465 he stated that "It's someone's pipe dream." He also expressed suspicion with respect to the estimate of 200,000 tons of gold-silver ore indicated in the Reward Brown placement memorandum. He also described the estimate that drilling would establish a minimum of 700,000 tons of gold-silver ore that would average in excess of .4 ounces of gold per ton and 10 ounces of silver per ton as "a fantasy". A compilation of assays was done by Mr. Skinner for a former owner of the property from samples taken on the Reward Brown property over a period of some 20 or 30 years in very divergent locations. One sample is from tailings, which are left over from the milling process. His report was included in the Reward Brown placement memorandum and when Mr. Skinner discovered this, he notified Mr. Valentine to remove the report as unauthorized. We also note that although a series of reports issued by International in 1982 and 1983 alleged that a new gold vein had been discovered in the International adit (tunnel) at the Reward Brown mines and that a complicated system of gold bearing veins had been intersected, a subsequent report in early 1984 indicated that the International engineers had been *466 premature in reporting that the main vein system had been struck and that the ore did not contain values sufficiently concentrated to warrant refining. The structure of the financing for the contemplated mining costs is also a relevant consideration in determining whether the transactions had economic substance. Here, the bulk of the purported mining costs in each of the three mining programs was to be financed through the execution of promissory notes by the purchasers of mineral aggregate in favor of Lloyd's, an off-shore corporation, and the subsequent funding of such mining costs by Lloyd's. The existence of Lloyd's is shrouded in obscurity. The record is not clear as to the location of the notes as of the time of trial. Moreover, the record is singularly unclear as to the extent of the actual funding provided by Lloyd's. Nor does the record show when, if at all, the notes were funded. None of the petitioners here involved received any gold mined from their aggregates. Moreover, with the exception perhaps of a single unidentified investor in these mining programs, none of the hundreds of investors in such programs obtained any gold. In determining the economic substance *467 of the International mining programs, the very structure of the programs suggests the absence of any valid economic substance. International, which was chosen by all the petitioners as mining contractor, had no discernable mining experience. Mr. Como, the president of International and ostensibly the driving force behind the mining program, had a background in documentary films. He had no actual mining background in 1981. Mr. Whitley, the International executive who became president of Cassill mines, had no mining background. Finally, the economic substance of the International mining program promotions is markedly dubious in view of the actions brought against International and Mr. Como in 1985 by the SEC and early in 1986 by the Department of Justice. Pursuant to the SEC action, International and Mr. Como consented to an order of permanent injunction which provided in pertinent part that International would not obtain money or property by making untrue statements or omitting necessary material facts concerning the use of proceeds from the sale of its securities, the quantity of gold and silver available to be mined by the issuer of said securities, the prospects for obtaining *468 substantial tax benefits by investing in said securities, and the existence of third party loans to investors buying any such securities. With respect to the Department of Justice action, a final judgment of permanent injunction pursuant to a consent order, enjoined International and Mr. Como from participating in the marketing of tax shelters. In general, the final judgment enjoined International from organizing or assisting in the sale of a plan in which false statements were made with respect to the deductibility of mine development expenses, the existence of third party financing, the use of funds for mine development, and the opportunity for profit in the programs, and in which gross valuation overstatements were made with respect to the value of ore contained in the mining claims. For these reasons and upon consideration of the entire record, we conclude that the International mining transactions here involved were entered into by petitioners solely for tax benefits and were completely lacking in any discernible economic substance. In short, the transactions were a sham. Consequently, they will not be recognized for Federal income tax purposes. We so conclude. In view *469 of our conclusion, we need not consider other arguments made by the parties. We therefore hold that the petitioners in these cases are not entitled to the deductions they claimed in the years at issue with respect to their participation in the International mining programs. Respondent is sustained. Nor is there any merit in the argument made by some of the petitioners herein that some portion of the expenditures incurred is deductible under the provisions of section 165(a). Section 165(c), which applies in the case of individual taxpayers, limits losses under section 165(a) to those incurred in a trade or business or profit-motivated transactions and to casualty losses, including theft losses, incurred by such taxpayers. We find nothing in this record which would support a theft loss. In essence, the payments here involved were made to purchase a package of purported tax benefits with the attendant risks. Petitioners took these risks voluntarily and received exactly what they paid for. Under these circumstances, we must conclude that no loss deduction is warranted under section 165(c)(3). Horn v. Commissioner, 90 T.C. 908, 940-941 (1988); see Secoy v. Commissioner, T.C. Memo. 1987-286, *470 affd. without published opinion 869 F.2d 1498 (9th Cir. 1989). Moreover, since we have concluded that petitioners' activities with respect to the mining programs lacked economic substance, we must reject petitioners' remaining arguments sketchily made under the provisions of sections 165, 167, and 168. In the absence of any proven trade or business or profit-motivated activity engaged in during the period at issue, these statutory provisions simply do not apply. In docket No. 14473-88, petitioner John T. Rutland claimed a deduction of $ 5,000 on Schedule C of his 1984 tax return as interest expense. The business activity was identified as Alitolia Mining, purportedly gold mining. No other information appears on Schedule C. In his petition, Mr. Rutland alleges that he paid $ 5,000 to International for mining and development of his mineral aggregate at the Tiedeman mining program. Mr. Rutland testified that in 1984 he was permitted to switch two blocks of mineral aggregate from Alitolia Mining to the Tiedeman mining program upon making an "interest payment" of $ 5,000. It would appear that this payment was actually intended as a purported mining and development *471 expense and, under our holding above, such expenditure is disallowed. In any event, on the basis of this confusing record, we are unable to conclude that this payment was paid on a genuine indebtedness in order to be deductible as interest under section 163(a). See Hager v. Commissioner, 76 T.C. 759, 773 (1981). Thus, whether this enigmatic deduction is labeled as a mine development expense or as interest, the result is the same. We sustain respondent's disallowance of this deduction claimed by Mr. Rutland in 1984. Sections 6653(a) and 6653(a)(1) impose an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). No useful purpose would be served in discussing separately all of the petitioner-investors here involved. We have fully *472 described above the circumstances attendant upon each petitioner's involvement with the International mining programs and we perceive no need to do so again. With minor exceptions the procedures followed by petitioners in entering into the mining programs are markedly similar. For the most part, petitioners demonstrated a studied indifference to the economic plausibility of the gold mining programs with which they became involved. Petitioners generally accepted the packaged programs with little more than the assurances of an accountant, a return preparer, a relative or an acquaintance. There is scant evidence in the record as to the advice, if any, petitioners obtained from these sources. Nor is there anything in the record to establish a good faith reliance upon such advice or that the individuals dispensing such advice were in fact competent to do so. Even though they lacked any prior mining experience, petitioners made no serious effort to inquire into the economic aspects of the gold mining ventures. Given their lack of mining experience, petitioners' purported reliance on the contents of the private placement memoranda is not, standing alone, tantamount to due care. It *473 does not appear that they seriously questioned any of the salient features of the mining programs, such as the willingness of an unfamiliar off-shore entity to fund their substantial amounts of mining and development costs with no apparent concern for their credit worthiness. Nor did the absence of any identifiable unit of mineral aggregate, which was the indispensable ingredient of their investment in their particular gold mining program, appear to generate any concern or doubts as to the economic merit of the programs. In short, petitioners' actions show an absence of any diligent and good faith effort to investigate the soundness of the mining programs. The failure of petitioners to make a meaningful investigation beyond the promotional materials supplied by the sales people or to consult independent knowledgeable advisors was not reasonable or in keeping with the standard of the ordinarily prudent person. See LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. by unpublished opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), affd. without published opinion 956 F.2d 274 (9th Cir. 1992). On *474 this record, we conclude that petitioners are liable for the additions to tax under sections 6653(a), 6653(a)(1) and (2). See also Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531. Respondent determined additions to tax under section 6661(a) which respect to several of the petitioners for the taxable years and in the amounts as stated above in our findings of fact. [2]With respect to returns filed after December 31, 1982, section 6661(a) imposes an addition to tax equal to 25 percent of any underpayment of tax attributable to a substantial understatement of income tax. Pallottini v. Commissioner, 90 T.C. 498 (1988). A substantial understatement is one that exceeds the greater of either 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1). The amount of the understatement may be reduced by an amount for which there was substantial authority for the treatment adopted by taxpayer on his return. Sec. 6661(b)(2)(B)(i). This reduction is not available in the case of a tax shelter unless in addition the taxpayer reasonably believed that the claimed tax treatment *475 was "more likely than not" the proper tax treatment. Sec. 6661(b)(2)(C)(i)(II). For this purpose, section 6661(b)(2)(C)(ii) defines a tax shelter as any partnership or other entity or investment plan or arrangement the principal purpose of which is the avoidance or evasion of Federal income tax. Here we have found on the basis of the entire record that the International mining programs were shams without any economic substance. Claims based upon unreal or economic sham *476 transactions are not recognizable for tax purposes. Knetsch v. United States, 364, U.S. 361, 369 (1960); Horn v. Commissioner, 90 T.C. 908, 943 (1988). In view of the substantial tax benefits promised to purchasers of mineral aggregates in the mining programs, and the complete absence of any economic feasibility in the proposed mining activities, we find that the principal purpose of the programs here at issue was tax avoidance. Hence, the mining programs are considered tax shelters for section 6661 purposes. Sec. 6661(b)(2)(C)(ii); sec. 1.6661-5(b)(1), Income Tax Regs. We know of no authority that would support the positions taken by petitioners inasmuch as we have held that their participation in the mining programs was motivated solely by the tax benefits offered. See sec. 1.6661-3(b), Income Tax Regs. Moreover, we are convinced on this record that petitioners did not believe that the tax treatment on their returns was more likely than not the proper tax treatment. In view of the casual approach taken by petitioners to their supposed gold mining activity, the suspect method of financing, the mining and development costs gained through the device *477 of a promissory note which was henceforth ignored by everyone, the failure to monitor the mining programs except perhaps in some superficial fashion, all belie their professed desire to make a profit. As far as we can determine, they firmly believed only in the viability of their tax benefits. On this record, therefore, we hold that petitioners in the cases enumerated above in footnote 2 are subject to the additions to tax under section 6661(a). Section 6621(c) provides for an increased interest rate with respect to any "substantial underpayment" (greater than $ 1,000) in any taxable year "attributable to one or more tax motivated transactions". [3] The increased rate of interest applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to the enactment of the statute. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). The term "tax motivated transaction" includes any "sham or fraudulent transaction". Sec. 6621(c)(3)(A)(v). The statutory language encompasses transactions, such as the International mining programs involved in these cases, *478 which are without business purpose and lack any opportunity for profit. Cherin v. Commissioner, 89 T.C. 986, 1000-1001 (1987). Consequently, with respect to the underpayments involved in these cases attributable to the disallowed deductions incurred in connection with the International mining program transactions, the increased rate of interest applies. See sec. 6621(c)(1). Respondent is sustained on this issue. Decisions will be entered under Rule 155 in the following cases: docket No. 24835-85; docket Nos. 25210-85 and 14473-88; docket No. 20740-86; docket No. 21253-86; docket No. 22618-86; docket No. 16622-87; docket Nos. 20215-87 and 25636-88; docket No. 5602-88, and docket No. 13148-86. Orders will be issued restoring the following cases to the general docket for disposition of remaining issues: docket No. 43317-86; and docket Nos. 32627-87 and 39041-87 *479 . Footnotes
1. The following cases were consolidated for trial, briefing, and opinion: A. Gordon Keyes, Jr. and Barbara J. Keyes, docket No. 22618-86; Charles H. Merrill and Bernadette R. Merrill, docket No. 16622-87; Stanley M. Riffe and Phyllis W. Riffe, docket No. 20740-86; Wilbur L. Rigmaiden and Patricia R. Rigmaiden, docket No. 5602-88; Per T. Ron and Sonja Ron, docket Nos. 20215-87 and 25636-88; John W. Rutland, docket Nos. 25210-85 and 14473-88; Richard F. Standfest and Lucinda D. Standfest, docket No. 43317-86; Jolinda A. Traugh, docket No. 13148-86; Clione M. Vesely, docket No. 21253-86; James F. Wann, Jr. and Lavonne M. Wann, docket Nos. 32627-87 and 39041-87.↩
1. By Amendment to answer,respondent claimed an increased addition to tax under section 6661(a)↩ from 10 percent to 25 percent (or $ 2,135.50).
2. The sec. 6661(a) issue has been raised in the cases involving Jolinda Traugh (1982 and 1983), A. Gordon Keyes, Jr. and Barbara J. Keyes (1982), Richard F. Standfest and Lucinda D. Standfest (1982 and 1983), Per T. Ron and Sonja Ron (1982 and 1983), James F. Wann, Jr. and Lavonne M. Wann (1982 and 1983), Wilbur L. Rigmaiden and Patricia R. Rigmaiden (1982), and Stanley M. Riffe and Phyllis W. Riffe (1982). In those instances where respondent has raised the sec. 6661(a) issue in the amended answer, respondent has the burden of proof. Rule 142(a)↩.
3. In those cases where respondent raised the sec. 6621(c) issue by amended answer, respondent has the burden of proof. Rule 142(a)↩.